**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

LEE C. KRATZ,

               Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

               Defendant.

No. 12-CV-89-LRR

**RULING ON JUDICIAL REVIEW**

_____

**TABLE OF CONTENTS**

*I.*     **INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    **PROCEDURAL BACKGROUND.** . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*III.*   **PRINCIPLES OF REVIEW.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

*IV.*   **FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

      *A.*    *Kratz's Education and Employment Background.* . . . . . . . . . . . . . . **5**
      *B.*    *Administrative Hearing Testimony.* . . . . . . . . . . . . . . . . . . . . . . . **5**
           *1.*    *Kratz's testimony.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
           *2.*    *Vocational expert's testimony.* . . . . . . . . . . . . . . . . . . . . . **7**
      *C.*    *Kratz's Medical History.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
           *1.*    *Treating sources.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
           *2.*    *Non-treating sources.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

*V.*    *CONCLUSIONS OF LAW.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

      *A.*    *ALJ's Disability Determination.* . . . . . . . . . . . . . . . . . . . . . . . . **17**

---

[1] Plaintiff Lee C. Kratz originally filed this case against Michael J. Astrue, the Commissioner of Social Security. *See* Complaint (docket no. 2) at 1. On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court, therefore, substitutes Commissioner Colvin as the Defendant in this action. *See* Fed. R. Civ. P. 25(d).

1

    **B.**      *Claimant's Objections.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
          **1.**    *Kratz's RFC.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
          **2.**    *Mental impairment.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
               **a.**    *New evidence and weight of evidence.* . . . . . . . . . . . . **23**
               **b.**    *Veterans Affairs's determination.* . . . . . . . . . . . . . . . **26**
    **C.**      *Reversal or Remand.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**VI.**    **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**VII.**   **ORDER.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

## I. INTRODUCTION

The matter before this court is Plaintiff Lee C. Kratz's Complaint (docket no. 2) for judicial review of the Commissioner of Social Security's ("Commissioner") decision to deny his application for Title II disability insurance benefits.

## II. PROCEDURAL BACKGROUND

On March 22, 2010, Kratz applied for Social Security Disability Insurance benefits. In his application, Kratz alleged an inability to work since October 1, 2005 due to post-traumatic stress disorder, tinnitus, severe back pain and a fractured femur. On May 24, 2010, Kratz's application was denied.[2] Record at 79-87. On July 6, 2010, his application was denied on reconsideration. *Id.* at 89-97. On August 31, 2010, Kratz requested an administrative hearing before an ALJ. *Id.* at 98-99. On July 22, 2011, Kratz appeared via video conference with his attorney before ALJ Julie K. Bruntz. *Id.* at 40-58. Kratz and vocational expert Vanessa May testified at the administrative hearing. *Id.* On September 12, 2011, the ALJ denied Kratz's claim. *Id.* at 20-33. The ALJ determined that Kratz was not disabled and not entitled to disability insurance benefits because his medical impairments were not severe. The ALJ also determined that Kratz retained the residual functional capacity ("RFC") to perform medium work, including his past relevant

---

[2] The court notes that Kratz and the Administrative Law Judge ("ALJ") incorrectly state that Kratz's application for disability insurance benefits was initially denied on June 8, 2009. *See* Complaint at 2, September 12, 2011 Decision, Record at 23.

work as an automobile mechanic. Kratz appealed the ALJ's decision. *Id.* at 19. On July 13, 2012, the Appeals Council denied Kratz's request for review. *Id.* at 1-3. Consequently, the ALJ's September 12, 2011 decision was adopted as the Commissioner's final decision.

On September 11, 2012, Kratz filed the Complaint. The Commissioner filed an Answer on December 7, 2012. Answer (docket no. 8). On January 9, 2013 Kratz filed a brief arguing that there is no substantial evidence in the record to support the ALJ's denial of Kratz's application for Social Security Disability Insurance. Brief in Support of Complaint (docket no. 11). On March 8, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the court to affirm the ALJ's decision. Brief Resisting Complaint (docket no. 12).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." *Id.*

The court will affirm the denial of a claim for social security disability benefits "if the ALJ's decision is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010). Evidence is "[s]ubstantial evidence" if a "reasonable person would find it adequate to support" the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the

3

Commissioner's conclusion.'" (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000))).

In determining whether the ALJ's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but [it does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (A court's review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must] also consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.

*Id*. (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991)) (internal quotation marks omitted). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id*. at 691 (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's

4

decision, [the court] will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the court] would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.'" (quoting *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005))).

## IV. FACTS

### A. Kratz's Education and Employment Background

Kratz was born in 1949 and graduated from high school. Kratz also "[t]ook some courses at Kirkwood Community College on the GI bill." Record at 304. From August 20, 1969 through July 29, 1971, Kratz served in the United States Army.

Kratz worked as an automobile mechanic between 1967 and 2005. Then, he worked in automobile sales from August 2005 to June 2006. From 1996 to 2003, Kratz earned between $26,000 and $30,000 per year. *Id*. at 148-49. In 2004, Kratz earned $8,355.00 and in 2005, he earned $2,938.13. *Id*. at 148.

### B. Administrative Hearing Testimony

#### 1. Kratz's testimony

At the administrative hearing, Kratz's attorney inquired of Kratz whether anything specific happened on October 1, 2005, to make that particular date his disability onset date. Kratz answered, "[n]othing that I know of." *Id*. at 44. Kratz also testified that he last worked in October of 2006. When Kratz's attorney asked why Kratz stopped working in 2006, Kratz responded, "[o]h, I just no longer could work because I wasn't able to get along with the employees." *Id*. Kratz testified that, as a result of surgeries in 1998 and 1999, he experiences back pain. Kratz further testified that he tried to find a job and "did work briefly at a couple different auto repair shops. [In their] auto sales [department]." *Id*. at 47. Kratz's attorney asked, "did any of those opportunities work out for you?" *Id*.

5

Kratz answered, "[i]t didn't work out, it was just too much pain." Kratz also testified that he tried to do light house work, but that certain chores, like vacuuming, caused "too much twisting of [his] back." *Id.* at 49. Kratz further testified that he took over-the-counter medication for his back pain.

Kratz's attorney questioned Kratz about his mental health and Kratz testified that he began psychiatric treatment with the Department of Veterans Affairs ("VA") in June 2007. Kratz testified that he had routine appointments with his counselor every six months and that he made two to three calls per year for treatment as needed. Kratz also testified that he took Fluoxetine, an antidepressant. Kratz's attorney also asked about Kratz's sleeping patterns:

> Q: And getting back to your psychiatric issues, were you experiencing nightmares back [in 2006]?
> A: Yes, I was.
> Q: What about interrupted sleep, how was your sleep?
> A: Not good, two to four hours a night. The VA put me on a sleeping pill. I can't, Zopedia—
> Q: Okay.
> A: —which that helped considerably.
> Q: Do you still take those?
> A: Yes, I do.
> Q: All right. Did you sleep during the daytime then too?
> A: Afternoons. . . . I'd usually sleep for three hours.
> Q: And then you'd sleep for three hours and then still go to bed—
> A: Yeah.

*Id.* at 50.

The ALJ further questioned Kratz about his mental health:

> Q: And I know you've been diagnosed with post traumatic stress syndrome but you don't see a psychologist or counselor too often and your functioning has been looking pretty good to me in my review of the record. Can you explain to me how your post traumatic stress syndrome affects your functioning?

A:     The biggest problem I have, You Honor, is mood
swings and anger management problems. The reason
I don't get in to the VA as often as I do is they just
don't have the time. Their workload down there is
quite heavy so they basically only want to see me once
every six months or unless I call.

Q:     Have you been hospitalized for any mental health conditions since
your alleged onset date?

A:     I spent a few days in the hospital during their initial, when they did
the checkups on me, Your Honor.

Q:     And when was that?

A:     That was in the spring of 2007.

*Id.* at 52.

When asked about his alcohol abuse, Kratz testified that he quit drinking six months
before the hearing, but that, prior to September 30, 2010, he drank "about 12 cans of beer
a week." *Id.* at 56.

### 2. *Vocational expert's testimony*

At the hearing, the ALJ posed a hypothetical question to vocational expert Vanessa
May regarding whether an individual could return to his past relevant work as an
automobile mechanic if the individual:

> could occasionally lift and carry 50 pounds and could
> frequently lift and carry 25 pounds. This individual could
> stand or walk for six hours in an eight hour workday or sit for
> six hours in an eight hour workday. His ability to push and
> pull including the operation of hand and foot controls would be
> unlimited within the above weights. This individual could
> frequently climb ramps and stairs, ladders, ropes, and
> scaffolding, balance, stoop, kneel, crouch and crawl.

*Id.* at 54-55. The vocational expert testified that, under these conditions, the hypothetical
individual could return to his past work as an automobile mechanic. The vocational expert
stated that there were approximately 500 jobs in Iowa and 200,000 jobs nationally that fit
this description. The ALJ then provided a second hypothetical lowering the lifting

capabilities to "20 pounds occasionally and 10 pounds more frequently." *Id.* at 55. The vocational expert testified that under these restrictions, "[t]he sales person job would be available." *Id.*

Kratz's attorney also questioned the vocational expert about a hypothetical individual's ability to work:

> Q: If a person had more than three absences a month would they be able to sustain any employment in this, those sales jobs or in the, as the service station mechanic, the brake repairer, or the radiator mechanic?
>
> A: No, not on a full time basis.
>
> Q: And if that person were off task [10-15%] of the time would they be able to sustain employment?
>
> A: Most likely if it's consistently [10-15%] of the time, no, they would eventually lose the job

*Id.* at 57.

### C. *Kratz's Medical History*

Kratz's medical history includes an inguinal hernia repair surgery in 1987, a herniated disk repair surgery in 1997, tinnitus, post-traumatic stress disorder ("PTSD"), alcohol abuse and a broken upper femur and subsequent surgery in 2009.

### 1. *Treating sources*

Kratz began treatment at the Veterans Affairs Medical Center ("VAMC") in Iowa City, Iowa, on May 21, 2007. *Id.* at 333-36. On May 23, 2007, Audiologist Janette Rogers, M.A., diagnosed Kratz with high frequency sensorineural hearing loss, more commonly known as tinnitus. *Id.* at 329. Rogers noted that, while Kratz was a candidate for a hearing device, he did not meet the "VA entitlement criteria." *Id.*

On June 13, 2007, Kratz underwent an initial consultation with the psychiatry department at VAMC. *Id.* at 324-28. In this consultation, Dr. Stephanie Lopez, M.D., reviewed Kratz's medical history. Kratz related his experience of enduring heavy combat as a soldier in Vietnam and how it affected his behavior after returning to the United

8

States, including having survivor's guilt, insomnia and hypervigilance. Kratz also discussed his habit of drinking several beers per day. Dr. Lopez diagnosed Kratz with PTSD, Ethanol abuse and possible Major Depressive Disorder ("MDD") and assessed Kratz's Global Assessment Functioning level ("GAF")[3] at 60.[4] *Id.* at 327. Dr. Lopez prescribed an antidepressant. *Id.* at 327.

On July 25, 2007, October 1, 2007, and November 14, 2007, Kratz had a follow-up appointments with the psychiatry unit at VAMC with Dr. Sarah Hartz, M.D. *Id.* at 309-23. During these visits, Dr. Hartz adjusted Kratz's antidepressant medication and prescribed another medication for Kratz's insomnia. Kratz reported sleeping better but continued to feel depressed and unmotivated. *Id.* at 314.

On November 16, 2007, Psychologist Sean C. Terry, Psy.D., examined Kratz for an initial Compensation and Pension ("C & P") Examination. *Id.* at 300-09. Dr. Terry noted that Kratz's PTSD symptoms included: (1) "[r]ecurrent and intrusive distressing recollections of the event"; (2) "[e]fforts to avoid thoughts, feelings, or conversations associated with the trauma, [e]fforts to avoid activities, places, or people that arouse recollections of the trauma, [i]nability to recall an important aspect of the trauma, [and] [m]arkedly diminished interest or participation in significant activities"; and (3) "[d]ifficulty falling or staying asleep, [i]rritability or outbursts of anger, [h]ypervigilance,

---

[3] *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010) ("'The [GAF] score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning.'" (quoting *Wesley v. Comm'r of Soc. Sec.*, No. 99-1226, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000)) (internal quotation marks omitted).

[4] A GAF level of 51-60 denotes: "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (Michael B. First, M.D., ed., 4th ed. text revision 2000) ("DSM-IV-TR") (emphasis omitted).

[and] [e]xaggerated startle response." *Id.* at 307. Dr. Terry found that Kratz's symptoms caused clinically significant distress or impairment in social, occupational or other important areas of function. *Id.* at 308. Dr. Terry also noted that Kratz's PTSD symptoms "have been present since combat, but have worsened in [the] last year when [Kratz's] brother (Vietnam vet) committed suicide. Symptoms [are] present more days than not. Severity is moderate to severe." *Id.* Dr. Terry assessed Kratz's GAF level at 50[5] and noted that Kratz felt the psychiatric treatment at VAMC helped. *Id.* at 309.

Dr. Michael D. Simison, M.D., examined Kratz on January 7, 2008, February 27, 2008, April 28, 2008, and July 30, 2008. *Id.* at 416-32. Dr. Simison noted that Kratz's nightmares and sleeping habits improved with the use of medication but that Kratz worried more about financial matters and his inability to find a job. *Id.* at 416. Kratz reported difficulty finding a job because of his limited skills, physical limitations from previous a back injury and discomfort in groups of people. *Id.* In February and April, Dr. Simison assessed Kratz's GAF level at 60. *Id.* at 427, 429. In July, Dr. Simison assessed Kratz's GAF level at 59. *Id.* at 417.

On August 12, 2008, Dr. Rhonda M. Mobley, Ph.D., performed a second C & P examination on Kratz. *Id.* at 403. Dr. Mobley noted, "[s]ince [Kratz's] most recent C & P examination for PTSD[,] his overall functioning has decreased in terms of social, occupational, marital and family functioning." *Id.* at 412. Kratz reported that he was "precluded from all sustain[able] gainful employment" in light of his "physical and mental disabilities." *Id.* Dr. Mobley stated:

> [Kratz] continues to have impaired occupational, marital and
> family, social, interpersonal and cognitive functioning which

---

[5] A GAF level of 41-50 denotes: "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

has impaired his ability to function in gainful employment even in his usual occupation. . . . He is exhibiting seriously depressed mood with suicidal ideations, continues to have PTSD symptoms including sleep impairment, nightmares, anxiety and ongoing alcohol use on a frequent and regular basis.

*Id.* at 414-15. Dr. Mobley assessed Kratz's GAF level at 49. *Id.* at 411.

On August 22, 2008, Dr. Wayne Page, M.D., reviewed Kratz's medical records, took Kratz's history, and performed a physical exam on Kratz. *Id.* at 401. Dr. Page found there were no factors, individually or altogether, that preclude Kratz from all substantially gainful employment. *Id.* at 401. Dr. Page noted:

[Kratz] reported on the [September 2007] C & P examination [that] he was unemployed because he could not find work, not because he was unable to work. He reports no problems related to reflux and hernia repair. He reports vague functional restrictions related to the 1997 [back surgery]. The tinnitus has been present (unchanged) since combat service[].

*Id.* In addition, Dr. Page noted that Kratz could "walk for miles without problem," but that Kratz's back pain interfered with his usual daily activities. *Id.* at 377, 400. Specifically, Dr. Page noted that Kratz's back pain had a moderate effect on his ability to exercise, play sports and engage in other recreational activities and a mild effect on his ability to complete chores, go shopping, travel and drive. *Id.* at 400-01. Finally, Dr. Page noted that Kratz felt pain with bending. *Id.* at 401.

On September 26, 2008, Dr. Simison examined Kratz and assessed his GAF level at 55. *Id.* at 374. Then, on November 14, 2008, Dr. Simison examined Kratz and assessed his GAF level at 60. *Id.* at 371. Finally, on December 30, 2008, Dr. Simison examined Kratz and assessed his GAF level at 65.[6] *Id.* at 581. Dr. Simison noted that

---

[6]A GAF level of 61-70 denotes: "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well,

Kratz's sleep and mood improved with the use of medication. On November 20, 2008, the VA found that Kratz was entitled to retroactive individual disability benefits since June 20, 2007. *Id.* at 862-65. The VA rated Kratz's PTSD as 70% disabling since April 29, 2008.[7] *Id.* In December 2008, Dr. Simison noted that this benefit award "significantly lightened [Kratz's] financial stressors" and Kratz reported that "things continue to go well" though he still experienced "some residual irritability." *Id.* at 580.

In 2009, Kratz visited the psychiatry unit at VAMC twice, on March 11, 2009, and June 5, 2009. *Id.* at 598, 588. Kratz reported feeling better and stated that he enjoyed volunteering at his granddaughter's school and doing yard work. However, Kratz also reported PTSD symptoms of mild depression, flashbacks and a tendency to avoid people. *Id.* at 575. Dr. Hristina Koleva, M.D., assessed Kratz's GAF level at 65 on March 11, 2009. *Id.* at 601. Dr. Stephen Pallone, M.D., assessed Kratz's GAF level at 70 on June 5, 2009. *Id.* at 590.

On December 30, 2009, Kratz fell while ice-skating and fractured the upper part of his right femur at the hip joint. *Id.* at 604. He underwent surgery the following day and was released from the hospital on January 2, 2009. *Id.* at 604, 729. On February 12, 2010, Kratz had a follow-up appointment and reported right hip and knee pain. *Id.* at 771. Nurse practitioner, Eva Kuykendall, M.S.N., recommended Kratz attend physical therapy and wean himself off of prescription pain medication. *Id.* at 772.

Dr. Raymond Crowe, M.D., examined Kratz on February 24, 2010, for a psychiatry follow-up and noted that Kratz's "PTSD symptoms are generally controlled." *Id.* at 766. Dr. Crowe assessed Kratz's GAF level at 70.

On March 8, 2010, Kratz had a physical therapy consultation. *Id.* at 760. Kratz

---

has some meaningful interpersonal relationships. DSM-IV-TR at 34 (emphasis omitted).

[7] The VA originally rated Kratz's PTSD as 50% disabling on November 30, 2007. *Id.* at 875-85.

reported that his pain level varied from 1 to 8 out of 10 and was aggravated by sitting or standing for long periods. *Id*. at 762. Kratz attended physical therapy sessions on March 12, 2010, March 19, 2010, March 25, 2010, March 31, 2010, April 12, 2010, and May 11, 2010. Kratz was discharged from physical therapy on May 11, 2010. *Id*. at 778. Physical Therapist Jessica Visser noted that Kratz felt sore at physical therapy, not only from physical therapy exercises, but also from other activities, including making home repairs and activities related to Kratz's moving from one house to another. During the physical therapy sessions, Kratz also stated that he felt the physical therapy was helping. On May 11, 2010, Visser noted that Kratz had "made significant improvements in his strength" and "has met [physical therapy] goals." *Id*. at 779.

On August 12, 2010, Dr. Obiora Onwuameze, M.D., Ph.D., examined Kratz for a psychiatry follow-up. *Id*. at 816. Kratz reported that he had been stable since his last visit on February 24, 2010, but that hip pain caused him to avoid certain activities and sleep poorly. Dr. Onwuameze assessed Kratz's GAF level at 65. *Id*. at 819.

On August 13, 2010, at an orthopaedic follow-up appointment with Dr. Stephen P. Compton, M.D., Kratz reported that he felt ongoing mild pain over his right hip which became aggravated by activity and by sitting in a car. *Id*. at 815. X-rays of Kratz's hip showed that the fracture was well healed, though he walked with a slightly antalgic gait. *Id*. On November 10, 2010, Kratz reported a stabbing pain in his hip at his primary care appointment with Dr. Alan C. Robb, M.D. *Id*. at 811. Dr. Robb noted that the cause of the hip pain was unclear and an x-ray showed no signs of acute disease. Dr. Robb further noted that non-steroidal anti-inflammatory drugs were not working and prescribed a muscle relaxant for Kratz's pain. *Id*. at 813. On March 10, 2011, Kratz visited VAMC complaining of sharp pain in his left thumb joint and was later diagnosed with arthritis. *Id*. at 835-38.

Kratz had a psychiatric follow-up appointment on May 18, 2011, with Dr. Dustin

DeYoung, M.D. *Id.* at 913. Dr. DeYoung assessed Kratz's GAF level at 65. *Id.* at 917. On August 10, 2011, Dr. Amanda C. Elliott, D.O., examined Kratz at a follow-up appointment and assessed Kratz's GAF level at 60. *Id.* at 908-11. On November 16, 2011, Dr. Elliott examined Kratz again and assessed his GAF level at 55. *Id.* at 901-03. Kratz reported that the prescription medications helped with mood, sleep and nightmares, but that he still experienced irritability and stress exacerbated by financial troubles. *Id.* at 901-19. On August 10, 2011, Kratz expressed that "[b]eing around other people tend[ed] to make him feel angry." *Id.* at 908.

On August 10, 2011, Dr. Elliott completed a Psychiatric/Psychological Impairment Questionnaire. *Id.* at 848-55. Dr. Elliott opined that Kratz was "[m]arkedly limited" (defined as a limitation that "effectively precludes the individual from performing the activity in a meaningful manner") in his ability to: work in coordination or proximity with others; complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact with the general public; accept instructions and respond appropriately to criticism; get along with co-workers or peers; and travel to unfamiliar places or use public transportation. *Id.* at 850-53. Dr. Elliott found that Kratz was "[m]oderately limited" (defined as a limitation that "significantly affects but does not totally preclude the individual's ability to perform the activity") in his ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; ask simple questions or request assistance; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting. *Id.* at 850-52. Furthermore, Dr. Elliott opined that Kratz was likely to miss more than three days of work per month because of his impairments and that he had been suffering from PTSD symptoms since approximately 1980. *Id.* at 855. Dr. Elliott also

14

noted that Kratz's psychiatric condition could potentially exacerbate his hip pain. *Id*. at 854.

On January 17, 2012, Kratz consulted Dr. Robb regarding pain in his hands, elbows and shoulders. *Id*. at 896. Dr. Robb noted that x-rays showed osteoarthritis and that steroid injections provided some relief. Dr. Robb also noted that Kratz's "right hip has some loss of motion and there is pain with flexion or internal or external rotation," but that Kratz "went to [the orthopaedics department] and they said there was nothing wrong [with Kratz's right hip joint] and nothing they can do for him." *Id*.

### 2. *Non-treating sources*

On December 29, 2008, Dr. David A. Christiansen, Ph.D., reviewed Kratz's psychiatric history on behalf of the state of Iowa. *Id*. at 469-82. Dr. Christiansen found that Kratz's medically determinable impairments were not severe and noted that Kratz's GAF level fell in September 2008 but had improved by the following month. *Id*.

On January 29, 2009, Dr. Danice F. Klimek, M.D., performed a consultative examination on Kratz on behalf of the state of Iowa for the purpose of determining disability. *Id*. at 549. Dr. Klimek noted, "[p]hysical examination reveals a well-developed, well-nourished gentleman in no apparent distress at the time of examination." *Id*. at 551. However, Dr. Klimek also noted that Kratz had difficulty walking on his heels, decreased muscle strength in his left leg and back pain with movement. Dr. Klimek found that Kratz had continuous restrictions on his ability to sit, stand and walk; occasional restrictions on his ability to stoop, bend, crawl, kneel, navigate uneven surfaces, climb stairs and use his lower extremities; and frequent restrictions on his ability to travel and use tools. Finally, Dr. Klimek noted that Kratz had some difficulty hearing and understanding the conversation during the examination.

On March 11, 2009, Dr. Rene Staudacher, D.O., performed a Physical RFC Assessment and found that Kratz could occasionally lift or carry fifty pounds, frequently

lift or carry 26 pounds, stand or walk (with normal breaks) about six hours in a normal eight-hour workday, sit (with normal breaks) about six hours in an eight-hour workday and that his ability to push or pull was not limited.[8] *Id.* at 558. Dr. Staudacher reasoned that even though Kratz complained of back pain, he never sought prescription medication. *Id.* Dr. Staudacher found that Kratz's statement to Dr. Klimek that he suffered continuous back pain was "an apparent inconsistency with [Kratz's] reports to the VA." *Id.* at 559. Dr. Staudacher also noted that Kratz reported he could walk between two and three miles in a day and perform chores at home including gardening and working on cars. *Id.* Regarding the severity of Kratz's symptoms, Dr. Staudacher opined, "[t]here are several inconsistencies that are noted that somewhat erode the credibility of the claimant's allegation." *Id.* at 562.

On May 4, 2009, Dr. Laura Griffith, D.O., affirmed Dr. Staudacher's assessment, noting that since March 11, 2009, Kratz's only complaint had been to his primary care physician regarding a "fullness in his ear." *Id.* at 583.

On May 18, 2009, Dr. Rhonda Lovell, Ph.D., performed a case analysis of Kratz's medical history on behalf of the state of Iowa. *Id.* at 584. Dr. Lovell found that "[Kratz's] mental impairments remain nonsevere." *Id.* Dr. Lovell also noted that Kratz "reported continued anxiety and a tendency to avoid people, yet he volunteers at his [granddaughter's] school." *Id.* at 584.

On May 12, 2010, Dr. Christiansen reviewed Kratz's psychiatric history for a second time and, again, found that Kratz's medically determinable impairments were not

---

[8] The parties apparently agree that Dr. Staudacher relied on and misinterpreted Dr. Klimek's evaluation. *See* Brief Resisting Complaint at 19, Brief in Support of Complaint at 18. Dr. Staudacher stated, "Dr. Klimek opined that [Kratz] could . . . sit/walk/stand constantly. This position is given considerable [weight]." *Id.* at 559. Dr. Klimek actually found that Kratz had a continuous restriction on his ability to sit, stand and walk. *Id.* at 552.

severe. *Id.* at 781-94. Dr. Christiansen noted that although Kratz did not socialize, his mental health had improved with treatment. Also on May 12, 2010, Dr. Gary Cromer, M.D., performed a Physical RFC Assessment and found the same results as Dr. Staudacher found in March 2009. *Id.* at 795-802. Specifically, Dr. Cromer stated that Kratz's "[c]redibility is eroded to a degree by inconsistencies." *Id.* at 802. Dr. Cromer also relied on, and failed to correctly interpret, Dr. Klimek's January 2009 assessment of Kratz.[9] *Id.* at 802. On August 6, 2010, Dr. Myrna Tashner, Ed.D., performed a case analysis and found "no new evidence at the reconsideration level that would warrant alteration in the initial mental assessment." *Id.* at 806.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Kratz is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (*citing Eichelberger v. Barnhart*,

---

[9] Like Dr. Staudacher, Dr. Cromer misinterpreted Dr. Klimek's evaluation by noting, "Dr. Klimek opined that [Kratz] could . . . sit/walk/stand constantly. This position is given considerable [weight]." Record at 559. As previously noted, Dr. Klimek actually found that Kratz had a constant or continuous restriction on his ability to sit, stand and walk. *Id.* at 552.

17

390 F.3d 584, 590 (8th Cir. 2004)); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quoting *Goff*, 421 F.3d at 790) (internal quotations marks omitted).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. "It is 'the ALJ's responsibility to determine [a] [claimant's] RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] [claimant's] own description of [his or] her limitations.'" *Page*, 484 F.3d at 1043 (second and fourth alterations in original) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Kratz had not engaged in substantial gainful activity since October 1, 2005. At the second step, the ALJ concluded from the medical evidence that Kratz had the following severe impairments: remote history of L5 discectomy and a history of right hip fracture repaired by open reduction internal fixation. The ALJ also found that Kratz's hearing impairment and alcohol abuse were not severe. Finally, the ALJ determined that Kratz's "medically determinable impairment of post-traumatic stress disorder does not cause more than a minimal limitation in [Kratz's] ability to perform basic mental work activities and is,

therefore, considered a non-severe impairment." Record at 26. At the third step, the ALJ found that Kratz did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpart P, Appendix 1. At the fourth step, the ALJ determined Kratz's RFC as follows:

> [Kratz] had the residual functional capacity to perform medium work . . . . Specifically, [Kratz] was able to lift and carry 50 pounds occasionally and 25 pounds frequently, stand or walk for six hours out of a normal eight-hour workday with normal breaks, sit for six hours out of a normal eight-hour workday with normal breaks. His ability to push and pull, including operation of hand and foot controls, was unlimited within the aforementioned weights. He could frequently climb ramps, stairs, ladders, ropes, and scaffolds, as well as balance, stoop, kneel, crouch and crawl.

*Id*. at 28-29 (emphasis omitted). Also at the fourth step, the ALJ determined, by comparing Kratz's RFC with the physical and mental demands of the work as an automobile mechanic, that Kratz was capable of performing past relevant work as an automobile mechanic. Therefore, the ALJ concluded that Kratz is not disabled.

### B. *Claimant's Objections*

Kratz argues that the ALJ erred in two respects. First, Kratz argues that the ALJ's conclusion that Kratz has no severe mental impairments is not supported by substantial evidence. Second, Kratz argues that the ALJ erred by finding that Kratz retained the RFC to perform medium work. The court shall first address the ALJ's determination of Kratz's RFC and then the ALJ's findings regarding Kratz's PTSD.

### 1. *Kratz's RFC*

First, Kratz argues that the ALJ erred by failing to state the weight she gave to examining physician Dr. Klimek's assessment and by relying on non-examining consultative physicians assessments, namely, the assessments of Dr. Staudacher and Dr. Cromer, who misinterpreted Dr. Klimek's evaluation. Kratz argues that the court should

19

reverse the ALJ's determination of Kratz's RFC because it is not supported by substantial evidence on the record.

The ALJ decided this case at step four of the five-step sequential evaluation. It is the claimant's burden to establish his RFC at step four. *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003). The RFC "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96–8p, 1996 WL 374184 (July 2, 1996). When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's RFC. *Baldwin*, 349 F.3d at 556; *Pearsall*, 274 F.3d at 1217. An ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations." *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) (internal quotation marks omitted)).

Furthermore, "[w]ell-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his [or her] case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). "The ALJ possesses no interest in denying benefits and must act neutrally in developing the record." *Id*. "'The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.'" *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) (quoting *Barrett*

*v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994). The ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)

Here, the ALJ "afforded significant weight regarding [Kratz's] exertional capabilities" to the assessments of Dr. Staudacher and Dr. Cromer. Record at 31. The ALJ stated that those assessments were "largely consistent with the weight of the objective medical evidence of record." *Id.* However, in early 2009, Dr. Klimek examined Kratz and found that Kratz had a continuous restriction on his ability to sit, stand and walk, and further noted that Kratz needed to change positions frequently because of back pain. *Id.* at 552. Dr. Staudacher interpreted, and Dr. Cromer agreed, that Dr. Klimek's assessment stated that Kratz had a continuous ability to sit, stand and walk in an eight-hour workday. Neither physician recognized any restrictions Kratz may have on these abilities. In her analysis, the ALJ did not address Dr. Staudacher and Dr. Cromer's mistakes and, instead, afforded their opinions "significant weight" with regard to Kratz's exertional capabilities. *Id.* at 31.

After a thorough examination of the record, the court finds that insufficient medical evidence is available concerning Kratz's physical capabilities. Specifically, because the opinions of the consultative physicians are unreliable, there is a lack of medical evidence supporting the ALJ's determination of Kratz's RFC. Dr. Klimek's assessment indicates that Kratz has continuous restrictions on his ability to sit, stand and walk but does not elaborate on how those restrictions may limit his ability to work. The ALJ failed to adequately discuss Dr. Klimek's medical opinion and how his findings may affect Kratz's ability to perform his past relevant work as a mechanic. Thus, the court finds that the ALJ's determination of Kratz's RFC is not supported by substantial evidence and remands to the ALJ to fully and fairly develop the record.

## 2.    *Mental impairment*

Next, Kratz argues that the ALJ's conclusion that Kratz has no severe mental impairments is not supported by substantial evidence because: (1) new and material evidence indicates that Kratz's PTSD is severe; (2) the ALJ did not give sufficient weight to the opinions of treating physicians; (3) opinions of non-examining physicians, standing alone, do not amount to substantial evidence; and (4) the ALJ did not explain what weight she afforded to the VA's finding that Kratz was entitled to benefits.

In finding that Kratz's PTSD was a non-severe impairment, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listings of Impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. First, the ALJ found that Kratz's daily living activities were unimpaired by his PTSD based on his ability to see to his own personal needs, drive, do light housework and make home repairs.   Second, the ALJ found that Kratz's social functioning was only mildly limited.   The ALJ based this finding on Kratz's ability to volunteer at his granddaughter's school and on his GAF scores, which "indicate that [Kratz's] general social functioning is only mildly limited, with brief, intermittent periods of more significant restrictions."   Record at 27.   Third, the ALJ found that Kratz's concentration, persistence and pace were not limited based on his ability to manage his own finances, follow instructions, read, watch television and run errands.   Finally, the ALJ found that Kratz had no episodes of decompensation of extended duration.   Thus, based on these findings, the ALJ determined that Kratz's mental impairments were not severe.   The ALJ also noted that her findings are not wholly inconsistent with Dr. Mobley's August 2008 assessment because after Kratz received mental health treatment and stopped drinking alcohol, "his social and occupational capabilities have accordingly improved."   *Id*. at 28.

### a.    New evidence and weight of evidence

Kratz argues that, because of new evidence, the ALJ's finding that Kratz's PTSD is not severe is not supported by substantial evidence. Specifically, Kratz points to the newly submitted opinions and findings of Dr. Elliott as evidence that Kratz's PTSD is severe. Kratz also contends that by not considering Dr. Elliott's findings, the ALJ failed to adequately weigh the opinion of a treating physician and improperly afforded too much weight to the opinions of consultative physicians.

In its decision, the Appeals Council stated that it considered the additional evidence submitted by Kratz, and found "no reason under [its] rules to review the Administrative Law Judge's decision." *Id.* at 1.

In *Cunningham v. Apfel*, 222 F.3d 496 (8th Cir. 2000), the Eighth Circuit explained the effect of new evidence submitted to the Appeals Council for a reviewing court:

> The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970(b). The newly submitted evidence thus becomes part of the 'administrative record,' even though the evidence was not originally included in the ALJ's record. *See Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. *See* 20 C.F.R. § 404.970(b). Here, the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion. In these circumstances we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination. *See Nelson*, 966 F.2d at 366.

*Id.* at 500; *see also Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008) (The final decision of the Commissioner should be affirmed if the decision "is supported by

substantial evidence on the record as a whole, including the new evidence that was considered by the Appeals Council."); *Nelson*, 966 F.2d at 366 ("The newly submitted evidence is to become part of what we will loosely describe as the 'administrative record,' even though the evidence was not originally included in the ALJ's record. . . . If, as here, the Appeals council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision."). In *Riley v. Shalala*, 18 F.3d 619 (8th Cir. 1994), the Eighth Circuit noted that a reviewing court:

> must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing. We consider this to be a peculiar task for a reviewing court.

*Id*. at 622

Because the court has already determined that this case should be remanded for further consideration, the court will not "speculate . . . on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing." *Id*. Instead, the court directs the ALJ, on remand, to consider and weigh Dr. Elliott's findings and the other new medical evidence herself.

In weighing the evidence, the Eighth Circuit has instructed:

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted); *see also* 20 C.F.R. § 404.1527(d)(2). The regulations require the ALJ to give reasons for giving weight to

or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2); *see also Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) ("Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." (quoting 20 C.F.R. § 404.1527(d)(2))). "The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ accords "controlling weight" to treating physicians' conclusions unless the ALJ finds the opinions to be "'inconsistent with or contrary to the medical evidence as a whole.'" *Id.* (quoting *Hacker*, 459 F.3d at 937 and *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003)).

Generally, "[t]he opinion of a consulting physician who examines a claimant once" does not constitute "substantial evidence." *Anderson v. Barnhart*, 344 F.3d at 812 (quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (internal quotation marks omitted)). There are two exceptions to that general rule. *Id.* An ALJ's decision to credit a one-time consulting physician's opinion and discount a treating physician's opinion should only be upheld: "'(1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id.* (quoting *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)). Moreover, when the claimant is a new patient to the treating physician, that physician's opinion need not be given the controlling weight that is typically given to a treating source. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) ("[The treating physician's] March letter . . . is not entitled to controlling weight as a medical opinion of a treating source. When [the treating physician] filled out the checklist, [she] had only met with [the claimant] on three prior occasions."). The regulations state: "Generally, the longer a treating source has treated

25

you and the more times you have been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i).

On remand, the court directs the ALJ to weigh the evidence, including any new evidence admitted to the record, accordingly. Of particular import are Dr. Elliott's findings that Kratz had a GAF rating of 55 on November 16, 2010; that Kratz was markedly limited in his ability to work in coordination or proximity with others, complete a normal workweek without interruptions from psychologically based symptoms and interact with the general public; and that Kratz was likely to miss more than three days of work per month because of his impairments.

### b. *Veterans Affairs's determination*

Kratz argues that the ALJ erred by failing to state what weight she gave to the VA's determination that Kratz was entitled to disability benefits based on his PTSD since June 2007.

Although a VA determination or finding is not binding, the Eighth Circuit has stated that a "'VA finding [is] important enough to deserve explicit attention' and must be considered by the ALJ." *DuBois v. Barnhart*, 137 Fed. App'x 920, 921 (8th Cir. 2005) (alteration in original) (quoting *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998)). However, in *Pelkey v. Barnhart*, 433 F.3d 575 (8th Cir. 2006), the Eighth Circuit found that an ALJ sufficiently considered a VA finding of 60% disability even though the ALJ did not explicitly reference the 60% disability rating when the ALJ explicitly discussed the original VA rating of 20% disability and the underlying medical evidence which formed the basis for the later finding of 60% disability. *Id.* at 579.

Unlike in *Pelkey*, the ALJ, in the instant matter, does not explicitly reference the original November 30, 2007 VA finding that Kratz's PTSD was 50% disabling or the November 20, 2008 VA finding that Kratz's PTSD was 70% disabling. The ALJ does address Dr. Mobley's evaluation, on which the November 20, 2008 VA finding was based.

26

However, the court need not determine if this is a sufficient consideration of the VA findings because the court previously determined that a remand is appropriate and, thus, the court directs the ALJ to explicitly address the VA disability determination on remand.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g). "Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and [a court] find[s] that such a denial was improper, [the court], out of '[]abundant deference to the ALJ,' remand[s] the case for further administrative proceedings." *Buckler v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (quoting *Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998)). If, however, "the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992); *see also Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir. 1989) ("When the record is overwhelmingly in support of a finding of disability, there is not need to remand . . . for further consideration."); *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987) ( "Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand."); *Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability").

In the present case, the court concludes that the medical records as a whole do not "overwhelmingly support[] a finding of disability." *Id.* Instead, the ALJ afforded

significant weight to inadequate consultative opinions regarding Kratz's exertional capabilities and failed to state the weight she gave to Dr. Klimek's assessment of Kratz's exertional capabilities, which was misinterpreted by the consultative physicians. Accordingly, the court finds that remand is appropriate.

## VI. CONCLUSION

The court concludes that this matter should be remanded to the Commissioner for further proceedings. First, on remand, the ALJ shall address the Dr. Klimek's assessment and the mistaken interpretation of Dr. Klimek's assessment by Dr. Staudacher and Dr. Cromer. Second, the ALJ shall discuss the weight of these opinions in determining Kratz's RFC. Third, the ALJ shall consider the appropriate weight to afford new evidence provided by Kratz, specifically, the opinions of Dr. Elliott. Finally, the ALJ shall explicitly consider the VA disability determination.

## VII. ORDER

For the foregoing reasons, this matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g), for further proceedings as discussed herein.

**IT IS SO ORDERED.**

**DATED** this 22nd day of August, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

28